IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BARBARA R. JOHNSON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 07-685-SLR |
| | ) | |
| NANTICOKE MEMORIAL HOSPITAL, INC., and NANTICOKE HEALTH SERVICES, INC. | ) | |
| | ) | |
| Defendants. | ) | |

---

Eric M. Anderson, Esquire and H. Alfred Tarrant, Jr., Esquire of Cooch & Taylor, Wilmington, Delaware. Counsel for Plaintiff.

Michael P. Migliore, Esquire of Stradley Ronon Stevens & Young, LLP, Wilmington, Delaware. Counsel for Defendants. Of Counsel: Patrick R. Kingsley, Esquire of Stradley Ronon Stevens & Young, LLP, Philadelphia, Pennsylvania.

---

**MEMORANDUM OPINION**

Dated: March 31, 2010
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Plaintiff Barbara R. Johnson ("plaintiff") filed this action against defendants Nanticoke Memorial Hospital, Inc. ("NMH") and Nanticoke Health Services, Inc. ("NHS," collectively "defendants") on October 30, 2007. (D.I. 1) The complaint asserts claims under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et. seq.* ("ERISA") that defendants have failed to provide plaintiff with benefits due her pursuant to her ex-husband's participation in a pension plan administered by defendants. (*Id.*) Plaintiff further claims attorney fees pursuant to 29 U.S.C. § 1132(g)(1). (*Id.*) On April 15, 2008, defendants filed a motion for judgment on the pleadings. (D.I. 31) On March 25, 2009, this court denied defendants' motion for judgment on the pleadings, based on a scheduling order being entered, the parties having proceeded through discovery, and an approaching deadline for summary judgment motions. (D.I. 66) Presently before the court is defendants' motion for summary judgment including a request to award attorney fees. (D.I. 67; D.I. 68 at 19) The court has jurisdiction under 28 U.S.C. § 1331 and ERISA, 29 U.S.C. § 1001 et seq.

For the following reasons, the court will deny this motion.

## II. BACKGROUND

Edward H. Hancock ("Hancock") was formerly the President of defendant NMH and was married to plaintiff. (D.I. 1, ex. A; D.I. 68 at 2). As part of his compensation, NMH provided Hancock with a retirement plan. (D.I. 68 at 2) In 1993, NMH was reorganized into NHS, and Hancock entered into the Amended and Restated Unfunded Deferred Compensation Agreement ("Plan") with NHS as a continuation of the prior

retirement plan. (*Id.*) The Plan designates Hancock's beneficiaries as "his spouse if he is married at his death, or if he is not married at his death then his beneficiaries shall be his issue, **per stirpes**." (D.I. 1, ex. A at ¶ 4) (emphasis in original). The Plan also specifies that Hancock's interest would vest according to the following schedule: from inception on November 30, 1993 to June 30, 1994 – 80 percent; from July 1, 1994 through June 30, 1995 – 90 percent; and after June 30, 1995 – 100 percent. (D.I. 1, ex A at ¶ 3) The Plan specifies payments be made based on the vested percentage over fifteen years in sixty quarterly payments, on the first day of July, October, January, and April following termination of Hancock's employment. (*Id.*) The Plan does not specify any procedures to be followed for resolution of disputes, change of beneficiary, or determining the status of a domestic relations order. (D.I. 1, ex A; D.I 9 at ¶ 11) Instead, it provides that "[t]he Board of Directors of the Employer (or any committee to which the Board of Directors delegates this responsibility) shall have full power and authority to interpret, construe and administer this Agreement and the Board's interpretations and construction thereof and actions thereunder shall be binding and conclusive on all persons for all purposes." (D.I. 1, ex A at ¶ 9)

Plaintiff and Hancock were divorced subject to a Stipulation and Order ("Divorce Order") issued by the Family Court of the State of Delaware in and for Sussex County on August 18, 2003. (D.I. 1, ex. B). At the time, Hancock participated in two "non-qualified" plans with defendants. (*Id.*) With respect to these plans, the Divorce Order provided that:

> It is the intention of the parties that Wife shall be entitled to receive her portion of the non-qualified plans just as if she had received her share by Qualified Domestic Relations Order. Wife acknowledges that Husband shall be responsible for payment of taxes on the distribution. Wife's distribution shall be net of the actual taxes paid by Husband. Husband warrants that he will cooperate with Wife in giving his consent to such distribution, provide supporting documentation regarding taxes, and execute all necessary forms to carry out the intent of this paragraph. With respect to the [Plan], there are options for distribution that each party will make at the date of Husband's retirement. By way of example, if Wife elects a lump sum distribution rather than an annuity payment, Wife will reimburse Husband for taxes due as a result of any distributions made to Wife. . . . Nanticoke Memorial Hospital . . . has established [an account] at Mellon Private Asset Management, which is associated with the [Plan]. This account may not be divided. It is the objective of the parties that Wife and Husband will divide the account 50/50 based on the value of the account as of December 31, 2002. Wife's share of the account will be designated as (B) and Husband's share will be designated as (E). Wife will have the authority to make investment decisions prior to Husband's retirement. . . . Wife shall remain the beneficiary of this plan until Husband's retirement and until she has received her share of the plan.

(D.I. 1, ex. B at 5-6) Counsel in the divorce action for both plaintiff and Hancock were under the mistaken impression that a Qualified Domestic Relations Order ("QDRO"), as defined under ERISA at 29 U.S.C. 1056(d)(3)(B)(i), could not be legally entered for the Plan since it was a "non-qualified deferred compensation plan." (D.I. 74 at 11; D.I. 68 at 3). Therefore, although a QDRO was prepared for other plans in which Hancock participated, the Plan was not included and there was no attempt to prepare a document specifically designated as a QDRO which referenced the Plan. (D.I. 76 at 4) Division of the Plan between Hancock and plaintiff was to be executed as stipulated in the Divorce Order. (D.I. 1, ex. B at 5-6).

On July 17, 2003, prior to issuance of the Divorce Order, Hancock, as President of NMH, sent a memorandum ("Hancock Memo") to Doug Connell ("Connell"), then Sr. Vice President and Chief Financial Officer of NMH, directing Connell to take the following actions with respect to the investment in the deferred compensation account:

1. Split the monies in the Plan into two accounts, identified further as "E" and "B", and if unable to do so evenly to the nearest dollar, allocate the larger share to "B".
2. Give to plaintiff the "irrevocable right" to direct the investments in the "B" account, and to send all statements to plaintiff at "20 Barley Run, Seaford, DE 19973," but noting that plaintiff did not have the "right to make withdrawals or deposits into the [P]lan except as provided under the documents establishing the [P]lan."
3. Reserve unto Hancock the right to direct investments in the "E" account, and confirm that all board directed deposits would be made into the "E" account, all other deposits and withdrawals from the "E" account being subject to the Plan document.

(D.I. 74, ex. A). Connell discussed these directions with Hancock, telling Hancock he "would be more comfortable if [he, Connell,] knew the Board was in agreement with [the directions because], in effect, the funds belonged to the hospital, not to [Hancock], . . . and . . . the Board . . . was still . . . in care of those assets for the hospital." (D.I. 74, ex. C at 29-30) The Board then approved the directions. (*Id.* at 30) On August 22, 2003, four days after the date of the Divorce Order, Martin Cosgrove and William Riddle, the

President and the Treasurer of defendant NHS, sent a letter to Mellon ("Cosgrove Letter"), directing Mellon to implement the directions outlined in the Hancock Memo, specifically "delegat[ing] to [plaintiff] the right to direct the investments in plan 'B,'" and further asking that Mellon "contact [plaintiff] at 20 Barley Run, Seaford, DE 19973 in order to discuss the account." (D.I. 74, ex. A)

Hancock retired in November of 2004 (D.I. 1 at ¶ 7). On January 3, 2005, the first of sixty quarterly payments under the Plan were made, both to Hancock, and directly to plaintiff. (D.I. 1, ex. C) At some point after this time, plaintiff alleges that she inquired of Dean Swingle ("Swingle"), then Director of Finance for defendant NMH, as to whether she would continue to receive payments if, for example, Hancock died; Swingle allegedly assured her that she would. (D.I. 74 at 14). Defendants reported payments to plaintiff for tax years 2005 through 2007 on Form 1099-MISC. (D.I. 74, ex A.) Although Hancock was fully vested in the Plan by June 30, 1995, defendants did not collect and report FICA taxes as Hancock's interest vested. (D.I. 74 at 14) On October 13, 2006, Ira Mirsky ("Mirsky") of Ernst & Young, who was retained by defendants, sent a letter to NHS advising that this failure required correction as it could lead to additional tax liability for defendants. (*Id.*) Mirsky also noted in his letter that:

> Mr. Hancock was maxed-out on the Social Security wage base for each of the years in which his [Plan] benefits were contributed/vested and, therefore, he would only have been subjected to the 1.45% Medicare component of FICA taxes on his [Plan] benefits if they had been taken into account as "wages" for FICA tax purposes, at that time.

(*Id.*) On November 10, 2006, Connell sent a letter ("Connell Letter") on NHS stationery to plaintiff enclosing a 1099-MISC form and stating:

> I am enclosing a memo from Ernst & Young regarding your Deferred Compensation Plan. It is our intention to distribute the remaining balance, in this plan, to you in January 2007. A calculation of the **estimated** distribution is enclosed. Due to the corrections made related to the accompanying form, we have amended our payroll tax returns and have paid additional FICA tax expense. Your portion of these taxes owed to Nanticoke Memorial Hospital is detailed below. We will withhold this amount from your final distribution.

(D.I. 74, ex. A) (emphasis in original) Included in the letter was a table showing corrected amounts for FICA tax for 2005 and 2006 totaling $1,530.84. The estimated January 2007 distribution showed a "Gross Distribution" of $400,000.00 with deductions for Social Security Tax, Medicare Tax, Federal Withholding, and State Withholding, and also a deduction for "Payroll Taxes Due to NMH" of $1,530.84. (*Id.*)

NHS began withholding FICA taxes from payments to plaintiff beginning with the August 2006 payment, including FICA taxes that defendants allege should have been withheld from distributions prior to August 2006. (D.I. 9 at ¶ 10)

On August 23, 2006, George Ruff, a C.P.A. engaged by plaintiff, sent an email message ("Ruff Email") to plaintiff informing her that he had spoken that day with Swingle to understand why it is "taking so long to get the deferred comp. plan straightened out" and, further, that defendants "would refund the FICA and Medicare taxes withheld from the check [plaintiff] received if it was done in error." (D.I. 74, ex. A)

Shortly after filing her complaint, defendants ceased making any payment to plaintiff, explaining that the prior payments were a "voluntary accommodation" to Hancock that they had no obligation to continue. (D.I. 9 at ¶ 8; D.I. 74 at 5)

**III. STANDARD OF REVIEW**

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita*, 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**IV. DISCUSSION**

Defendants assert that plaintiff does not have standing to bring a claim under ERISA with respect to the Plan, arguing that she is neither a participant nor a beneficiary under the plan, that the Divorce Order does not alter the terms of the Plan, and that plaintiff also does not have standing to bring a claim via equitable estoppel. (D.I. 68 at 4-19) Defendants argue that the Divorce Order is not a QDRO and, therefore, does not confer participant or beneficiary status upon plaintiff which would be required in order to bring a claim under ERISA. (D.I 68 at 9-12) Defendants also rely on ERISA's anti-alienation provision, 29 U.S.C. § 1056(d)(1), asserting that Hancock could not assign his benefits to plaintiff except via a QDRO. Defendants further argue that the same failure to establish participant or beneficiary status bars any claim of equitable estoppel under ERISA, and that the estoppel claim is based on representations made to plaintiff by Hancock, personally, in the Divorce Order to which defendants were not a party. (D.I. 68 at 12-19) With respect to attorney fees, defendants assert that, on the basis of warning letters they sent to plaintiff and the positions they have taken on the present matter, plaintiff should have been aware that her claims were frivolous. (D.I. 68 at 19-22)

Plaintiff responds that the Divorce Order qualifies as a QDRO, thereby conferring beneficiary status on her, that defendants have already accepted the Divorce Order as a QDRO, and it is now too late to claim otherwise. (D.I. 74 at 8-13) Plaintiff further responds that she is asking that defendants be equitably estopped from asserting

plaintiff is not a beneficiary in the event the court finds that the Divorce Order is not a QDRO. (D.I. 74 at 14-15)

**A. Standing**

"ERISA provides that '[a] civil action may be brought . . . by a participant or beneficiary . . . .'" *Pell v. E.I. duPont de Nemours & Co.*, 539 F.3d 292, 299 (3d Cir. 2008) (*citing* 29 U.S.C. § 1132(a)(3)). ERISA "confers beneficiary status on a nonparticipant spouse or dependent in only narrow circumstances delineated by its provisions." *Boggs v. Boggs*, 520 U.S. 833, 846 (1997). One such provision is a Qualified Domestic Relations Order ("QDRO"), "a type of domestic relations order that creates or recognizes an alternate payee's right to, or assigns to an alternate payee the right to, a portion of the benefits payable with respect to a participant under a plan." *Id.* (*citing* 27 U.S.C. § 1056(d)(3)(B)(i)). To qualify as a QDRO, a "domestic relations order" as defined at 27 U.S.C. § 1056(d)(3)(B)(ii) must clearly specify:

> (i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
> (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,
> (iii) the number of payments or period to which such order applies, and
> (iv) each plan to which such order applies.

29 U.S.C. § 1056(d)(3)(C). Additionally, a QDRO must not require a plan to provide any benefit or option, not otherwise provided under the plan, and must not require the plan to provide increased benefits (determined on the basis of actuarial value). 29 U.S.C. § 1056(d)(3)(D)(i)-(ii).

"QDRO's were enacted as part of the Retirement Equity Act ('REA'), an amendment to ERISA that took effect on January 1, 1985. " *Smith v. Smith*, 248 F.Supp.2d 348, 354 (D.N.J. 2003) (*citing* Pub.L. No. 98-397 § 303(d), 98 Stat. 1426 (1984)). "In creating the QDRO mechanism Congress was careful to provide that the alternate payee, the 'spouse, former spouse, child, or other dependent of a participant,' is to be considered a plan beneficiary." *Boggs*, 520 U.S. at 847 (*citing* 27 U.S.C. §§ 1056(d)(3)(K), (J)). "QDRO's, unlike domestic relations orders in general, are exempt from both the pension plan anti-alienation provision, § 1056(d)(3)(A), and ERISA's general preemption clause, § 1144(b)(7)." *Id.* at 846-47. "These provisions are essential to one of REA's central purposes, which is to give enhanced protection to the spouse and dependent children in the event of divorce or separation, and in the event of death [of] the surviving spouse." *Id.* "Apart from these detailed provisions, ERISA does not confer beneficiary status on nonparticipants by reason of their marital or dependent status." *Id.*

Whether or not a domestic relations order qualifies as a QDRO is a question of statutory construction. *Metropolitan Life Ins. Co. v. Price*, 501 F.3d 271, 282 (3d Cir. 2007) (citations ommitted). "The statutory language is explicit and emphatic." *Metropolitan Life Ins. Co. v. Wheaton,* 42 F.3d 1080, 1084 (7th Cir. 1994) (Posner, J.). "The purpose is to reduce the expense of ERISA plans by sparing plan administrators the grief they experience when, because of uncertainty concerning the identity of the beneficiary, they pay the wrong person, or arguably the wrong person, and are sued by a rival claimant." *Id.* (*citing Hurwitz v. Sher*, 982 F.2d 778, 782 (2d Cir.1992); *Carland v.*

*Metropolitan Life Ins. Co.*, 935 F.2d 1114, 1120 (10th Cir.1991)). The determination as to whether a domestic relations order meets the requirements set forth at 27 U.S.C. § 1056(d)(3)(B)-(D) may include consideration of extrinsic evidence. *See, e.g. Wheaton,* 42 F.3d 1080 at 1084-85; *Smith*, 248 F. Supp.2d at 355-57. In *Wheaton*, a life insurance company filed an interpleader to determine whether a widow named as beneficiary of her ex-husband's ERISA life insurance policy should receive the proceeds of the policy or whether they should instead be distributed to the ex-husband's sons pursuant to a divorce decree requiring the husband to name the sons as sole beneficiaries. *Id.* at 1081-82. Although the divorce decree itself did not specify the sons' addresses or the percentage to be allocated to each son, the Seventh Circuit held the divorce decree to be a QDRO by examining the surrounding circumstances at the time of the decree, evaluating the effect of differing interpretations, and finally concluding that the plan administrator did not face a likely risk of litigation arising from ambiguities as to the identity of the beneficiaries. *Id.* at 1084-85.

"Receipt of a domestic relations order by a plan imposes on it a number of duties in addition to the obligation to honor the order if it turns out to be a QDRO." *Winters v. Kutrip*, 47 Fed. Appx. 143, 147 (3d Cir. 2002).

> In the case of any domestic relations order received by a plan (I) the plan administrator shall promptly notify the participant and each alternate payee of the receipt of such order and the plan's procedures for determining the qualified status of domestic relations orders, and (II) within a reasonable period after receipt of such order, the plan administrator shall determine whether such order is a qualified domestic relations order and notify the participant and each alternate payee of such determination.

29 U.S.C. § 1056(d)(3)(G)(i). "[D]uring any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined," up to a maximum of 18 months, the plan must segregate any amounts that become payable to the alternate payee under the order. 29 U.S.C. § 1056(d)(3)(H). "'[O]nce the pension plan is on notice that a domestic relations order has issued that **may** be a QDRO,' the plan must put the required process in motion and maintain the status quo." *Winters*, 47 Fed. Appx. at 147 (*quoting Trustees of Directors Guild of America v. Tise*, 234 F.3d 415, 421 (9th Cir.2000) (emphasis retained)). "The converse is true by necessary implication: if a plan is not on notice that a domestic relations order has been entered that may be a QDRO, it is not relieved of its duty to meet its obligations to a participant and its beneficiary . . . ." *Id.* at 147-48. "[I]n the absence of a QDRO, a plan violates ERISA if it transfers funds to anyone other than the participant or his designated beneficiary." *Id.* at 147. However, "the statute does not absolutely require the plan administrator's receipt of the order for its qualification as a QDRO." *Smith*, 248 F. Supp. 2d at 359 (*citing Williams v. Williams*, 50 F. Supp.2d 951, 963 (C.D. Cal. 1999)).

At this stage of the proceedings, the court must look to the Divorce Order, the other evidence of record, and all reasonable inferences therefrom in the light most favorable to plaintiff, the non-moving party, to determine if plaintiff has standing to bring an action against defendants under ERISA. There is no dispute that the Plan is covered under ERISA, nor that the Divorce Order is a "domestic relations order" as defined at 27 U.S.C. § 1056(d)(3)(B)(ii). Therefore, the court will proceed next to

determine whether the Divorce Order comports with the QDRO requirements at 27 U.S.C. § 1056(d)(3)(C), by examining each of the four elements in turn. First, the Divorce Order does not explicitly specify the last known mailing address of the participant and the name and mailing address of each alternate payee covered by the order. Plaintiff argues that the required addresses are contained in the Divorce Order because it identifies a property in Seaford, Delaware which was awarded to plaintiff, and another property awarded to Hancock, and that these became their new residential addresses. The Hancock Memo clearly specifies that monthly statements concerning the "B" sub account were to be distributed to plaintiff at the same Seaford, Delaware address included in the Divorce Order. This is echoed in the Cosgrove Letter. Further, communications from defendants to plaintiff during all relevant times were sent to her at the Seaford, Delaware address. Although the record does not demonstrate that defendants knew of participant Hancock's address, clearly defendants were in possession of this information, and the record is devoid of any confusion or ambiguity over this fact. Second, the Divorce Order provides that the parties' intent was to "divide the account 50/50 based on the account value as of December 31, 2002." The percentage is clearly specified. The fact that it was an expression of intent and not a directive does not make it less so. The expression of intent resulted from divorce counsel mistakenly assuming that the account could not be divided, and thus specified the intent to divide the account evenly, since they were uncertain whether this could be accomplished. This uncertainty was removed by defendants' implementation of the 50/50 split as directed in the Cosgrove Letter just four days after the Divorce Order was

issued and, therefore, the parties intent took immediate effect. Third, the Divorce Order does not specify a number of payments. When a portion of a stream of payments is to be allocated to the non-participant spouse, specification of the number of payments or the period for which payments are to be divided is essential if ambiguity is to be avoided. Here, the property being divided is not a series of payments to the participant, but the participant's account itself. The Hancock Memo and Cosgrove Letter make clear that once divided, each sub account was to be managed entirely by its respective owner, including investment decisions. As discussed below, there were options for distribution of the account funds, such that specifying a number of payments or a period would do more to create ambiguity than to remove it. Fourth, the Divorce Order clearly specifies the Plan by name, and even identifies the underlying account number at Mellon. The Divorce Order meets the requirements of a QDRO at 27 U.S.C. § 1056(d)(3)(C).

However, the Divorce Order cannot be a QDRO unless it also meets the requirements at 27 U.S.C. § 1056(d)(3)(D). Defendants argue that the Divorce Order gives the plaintiff "the option to seek an annuity or lump sum payment," an option defendants allege is not in the Plan and, thus, the Divorce Order is not a QDRO because it provides a benefit not provided under the Plan pursuant to 29 U.S.C. § 1056(d)(3)(D)(i). (D.I. 76 at 4) The Divorce Order provides that, "[w]ith respect to the [Plan], there are options for distribution that each party will make at the date of [Hancock's] retirement. By way of example, ..." It does not **require** any option to be added that does not already exist. Further, the Connell Letter clearly indicates

defendants' intent to provide a lump sum payment to plaintiff of $400,000.00: "It is our intention to distribute the remaining balance, in this plan, to you in January 2007." Therefore, the court finds that the Divorce Order does not require the Plan to provide increased benefits, nor pay benefits to an alternate payee which are required to be paid to another alternate payee under a prior QDRO.

Defendants urge a strict construction of the Divorce Order, limiting the inquiry to its four corners. However, courts, including the Seventh Circuit and at least one court in the Third Circuit, have taken a broader approach to interpreting § 1056(d)(3)(C). That approach takes into consideration the objective of the REA, protection of divorced spouses, *inter alia*, and the likely risk of involving plan administrators in litigation over the **identity** of beneficiaries. Plaintiff is precisely the kind of person the REA was intended to protect. Further, there is no likely risk of litigation arising from overlapping claims to the funds from multiple claimants. Defendants allege that Hancock has released them from all liability. (D.I. 9 at ¶ 7) There is no evidence of record of any other claimant or potential claimant.

Further, the evidence points to a conclusion that defendants themselves determined that the Divorce Order qualified as a QDRO as of November of 2003 when the Cosgrove Letter "delegated to [plaintiff] the right to direct the investments in plan 'B.'" As defendants correctly point out in their brief, "Hancock was prevented from assigning away his right as a participant in the ARUDCA" under ERISA's anti-alienation provision, 29 U.S.C. § 1056(d)(1), save the exception for QDROs. (D.I. 68 at 7-8) Yet the Hancock Memo gave plaintiff the "irrevocable right" to direct the investments in

the"B" account, the Board approved the Hancock Memo, and the Cosgrove Letter directed Mellon to give it effect. Defendants claim that they did this as a voluntary accommodation to Hancock but fail to cite authority under ERISA that would permit them to do so. The court also is unable to locate a "voluntary accommodation" provision in ERISA that would allow, without a QDRO, alienation of fifty percent of a participant's rights in a plan. If defendants did not determine that the Divorce Order was a QDRO as of the date of the Cosgrove Letter, or at least as of the date of the first payment to plaintiff, they would necessarily be in violation of ERISA and subject to liability. Defendants do not admit to such a violation. Therefore, the inference is that defendants did not violate ERISA by alienating Hancock's rights to the Plan, but instead construed the Divorce Order as a QDRO. Further, defendants segregated plaintiff's half of Hancock's account from November 2003, the date of the Cosgrove Letter, until after August 2006, the date of the Connell Letter. If the segregation were done only during the maximum 18 month evaluation period permitted by ERISA, defendants would have had to recombine the accounts by May of 2005, yet failed to do so. Moreover, in 2006, the Connell Letter specified "I am enclosing a memo from Ernst & Young regarding your Deferred Compensation Plan," clearly indicating that defendants understood plaintiff to be the owner even as of that late date. For all the above reasons, the court finds that the Divorce Order qualifies as a QDRO under ERISA, thereby conferring standing on plaintiff to bring this action.

**B. Equitable Estoppel**

"The principle of estoppel is the 'representation of fact made to a party who relies thereon with the right to so rely, (that) may not be denied by the party making the representation if such denial would result in injury or damage to the relying party.'" *Rosen v. Hotel and Rest. Emp. & Bartenders Union of Phila., Bucks, Montgomery and Del. Counties, Pa.*, 637 F.2d 592, 597 (3d Cir., 1981) (citing 1 S. Williston, Williston on Contracts s 139, at 600 (3d ed. 1957); *Haeberle v. Board of Trustees of Buffalo Carpenters*, 624 F.2d 1132, 1139 (2d Cir. 1980)). A beneficiary may "obtain ... appropriate equitable relief ... to redress [ERISA] violations or ... to enforce any provisions of [ERISA]." *Pell v. E.I. DuPont de Nemours & Company Incorporated*, 539 F.3d 292, 300 (3d Cir. 2008) (*citing* 29 U.S.C. § 1132(a)(3)). "To succeed under this theory of relief, an ERISA plaintiff must establish (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances." *Id.* (*quoting Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 235 (3d Cir.1994)). Further, the remedy sought must be only one that was "typically available in equity." *Id.* At 306 (*quoting Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256, 258 n. 8 (1993)).

Defendants argue that plaintiff does not have standing to assert a claim under ERISA via estoppel. (D.I. 68 at 12) Plaintiff responds that this action is to estop defendants "from asserting that [plaintiff] is not a beneficiary and has no standing to sue when [defendants have] been treating [plaintiff] as a beneficiary for four years before this action was filed." (D.I. 74 at 24) Plaintiff is not seeking to directly redress ERISA violations or to enforce any provisions of ERISA via estoppel but, instead, is seeking to

prevent defendants from denying representations of fact made to plaintiff. The distinction is subtle but important. The applicable standard is whether (1) representations were made to plaintiff, (2) plaintiff had the right to rely on the representations, and (3) denial of the representations would result in injury or damage to the plaintiff. *See Rosen*, 637 F.2d at 597.

Defendants sent account statements to plaintiff over a period of years, allowed plaintiff to make investment decisions for the account, made a series of payments to plaintiff over a four-year period, sent 1099's to plaintiff for at least 3 successive years indicating that payments and withholding for taxes were reported to the Internal Revenue Service and other taxing authorities, and even sent a letter to plaintiff enclosing "a memo from Ernst & Young regarding your Deferred Compensation Plan, " and discussing defendants' intent to pay plaintiff the $400,000.00 remaining in the account as a lump sum in January 2007. The Ruff Email indicates that discussions over the propriety of the FICA deductions ensued for some time, and that the deductions would be refunded to plaintiff if found to be improper. It was not until after plaintiff filed this complaint in October 2007 that defendants took the position that plaintiff was not a beneficiary, was not entitled to these funds and that, instead, the remaining account balance would be transferred back to Hancock. The court finds that this series of actions and the documents provided plaintiff constituted representations to plaintiff that she was a beneficiary of the Plan, that plaintiff had the right to rely on these representations, and that if, assuming arguendo, the Divorce Order were found not to qualify as a QDRO, plaintiff would be injured to the extent that she would not have

standing to claim funds that have been withheld from her payments and the ability to receive the remainder of the Plan account. Even if the Divorce Order were not qualified to be a QDRO, the court holds that defendants are estopped from claiming that plaintiff is not a beneficiary under the Plan. Therefore, the court will deny defendants' motion for summary judgment on this basis.

### C. Attorney Fees

Defendants request award of attorney fees pursuant to 29 U.S.C. § 1132(g)(1), claiming that plaintiff's claim was asserted in bad faith, that the claims are patently and objectively without merit and were subjectively known to be without merit at the time the Complaint was filed. (D.I. 68 at 20-21) Defendants' request for attorney fees is denied as moot.

## V. CONCLUSION

For the reasons stated, the court will deny defendants' motion for summary judgment. (D.I. 67) Defendants' motion for an award of attorney fees, pursuant to 29 U.S.C. § 1132(g)(1), is denied. An appropriate order will issue.